CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
NOV 03 2010
JULIA C. DUDLEY, CLERK
BY: /s/ Pam Coleman
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| LESUEUR-RICHMOND SLATE CORPORATION, *Plaintiff,* | CASE NO. 6:09cv00068 |
| v. | MEMORANDUM OPINION |
| DAMIEN C. FEHRER, *et al*, *Defendants.* | JUDGE NORMAN K. MOON |

Plaintiff LeSueur-Richmond Slate Corporation ("LeSueur" or "Plaintiff") brings this action to recover damages pursuant to 42 U.S.C. § 1983, the Fourth Amendment to the United States Constitution, Article I, § 11 of the Constitution of Virginia, and Va. Code § 19.2-59. Plaintiff alleges that defendants Damien C. Fehrer ("Fehrer") and Vernon L. Harris ("Harris"), mineral mine inspectors with Virginia's Department of Mines, Minerals, and Energy ("DMME"); defendant James E. Smith ("Smith"), mineral mine inspector supervisor with DMME; and defendant Conrad T. Spangler ("Spangler"), director of the DMME's Division of Mines and Minerals (collectively "Defendants") engaged in repeated, illegal warrantless searches of Plaintiff's property during 2007 and 2008.

Defendants now move to dismiss on the basis of several theories: (1) claim preclusion; (2) *Younger* abstention; (3) qualified immunity; and (4) failure to state a claim. While I do not address the claim preclusion and *Younger* abstention theories, I find that Plaintiff fails to state a claim. For the reasons set forth below, I find that the warrantless searches in issue here are constitutional and Defendants are entitled to qualified immunity. Accordingly, Defendants' motion to dismiss will be granted with prejudice in an accompanying order.

1

# I.

DMME is the Virginia administrative body charged with enforcing Title 45.1 of the Virginia Code, which provides the law governing mines and mining in the Commonwealth. Within DMME, the Division of Mines and Minerals is specifically responsible for enforcing the Mineral Mine Safety Act, Va. Code § 45.1-161.292:1 *et seq* (the "MMSA"). In general, the MMSA provides that surfaces mineral mines that are inspected by the federal Mine Safety and Health Administration shall not be subject to inspection by the DMME. Va. Code § 45.1-161.292:54B. However, DMME "inspectors and other employees may enter such mines in order to . . . respond to complaints of violations of [the MMSA] and Chapters 14.5 (§ 45.1-151.293 et seq.) and 14.6 (§ 45.1-161.304 et seq.) [of Title 45.1 of the Virginia Code]." Va. Code. § 45.1-161.292:54B. Under the DMME's *Procedures Manual*, in responding to a complaint "the mine inspector will inform the operator . . . of the nature of the complaint and the intention to conduct an investigation." Compl. Ex. D. The *Procedures Manual* also requires that:

> When investigating a safety complaint, the mine inspector will make effort to conduct the inspection so as not to divulge or direct attention to the complainant who will remain anonymous. This may require the inspection of a variety of equipment and areas other than those indicated in the original complaint.

*Id.* Plaintiff alleges that, read together, these provisions effectively give DMME unfettered access to its property, in violation of its rights under the federal Constitution, the Virginia Constitution, and state law.

The inspections giving rise to Plaintiff's claims followed five separate anonymous complaints.[1] Following the first such complaint on December 13, 2007, defendant Fehrer conducted a wide ranging investigation of the LeSueur property on December 21, 2007. This

---

[1] In evaluating a motion to dismiss, the court must construe the facts "in the light most favorable to the plaintiff." *Schatz v. Rosenberg*, 949 F.2d 485, 489 (4th Cir. 1991) (quoting *Battlefield Builders, Inc. v. Swango*, 743, F.2d 1060, 1062 (4th Cir. 1984)). Accordingly, this statement of facts is generally adapted from the complaint (docket no. 1).

"included inspections of the powder magazine and explosive transport truck and pit areas, review of MSHA citations, review of pre-shift, blasting, training and employee records, and interviews" with staff and management. Compl. ¶ 12. Still responding to the December 13 complaint, defendants Smith, Harris, and Fehrer entered the LeSueur property to review records and conduct additional interviews on four subsequent days, through January 15, 2008.

After DMME received the second anonymous complaint on January 3, 2008, Fehrer returned to the LeSueur property and "conducted an extensive and general inspection of its mining and manufacturing facilities." Compl. ¶ 16. DMME received another complaint on January 14, 2008. In response, Smith, Harris and Fehrer conducted an investigation spanning seventeen hours, and spread over four separate days, whereupon they inspected equipment and records, and conducted employee interviews. The final inspection in response to the January 14 complaint was on March 12, 2008. During the same period, defendant Spangler, as director of the Division of Mines and Minerals, made clear to Plaintiff that he "unequivocally supported" the conduct of the inspectors. Compl. ¶ 23.

Following a fourth complaint on March 7, 2008, Fehrer and Harris again conducted inspections spanning four separate days. Plaintiff characterizes these inspections as an "extensive and intrusive review of the company's property, equipment, practices and paperwork." Compl. ¶ 26. After a final complaint on April 6, 2008, Fehrer, accompanied by Harris on all but one occasion, made eight additional entries on the LeSueur property from April through June 2008.

Defendants conducted their investigations under color of state law. Plaintiff alleges that during each inspection of the LeSueur property, Defendants wore the uniform of the Division of Mines and Minerals, and other symbols of state authority. Compl. ¶ 10. In correspondence

3

between Spangler and Plaintiff, Spangler defended his staff's action as consistent with the Mineral Mine Safety Act. During one of the inspections following the March 7 complaint, Harris allegedly told a LeSueur official, "state law regarding our authority is very broad and we can do anything we think is needed." Compl. ¶ 28.

## II.

The purpose of a motion to dismiss under Rule 12(b)(6) is "to test the legal sufficiency of a complaint, rather than the facts alleged in support of it. . . ." *Hall v. Virginia*, 385 F.3d 421, 427 (4th Cir. 2004). Therefore, in considering a Rule 12(b)(6) motion, a court must accept all factual allegations in the complaint as true and must draw all reasonable inferences in favor of the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002); *see also Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 346 (4th Cir. 2005). A complaint should not be dismissed "unless it appears certain that the plaintiff can prove no set of facts which would support its claim and would entitle it to relief." *Hall*, 385 F.3d at 427 (quoting *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)).

In Count I of the complaint, Plaintiff seeks relief under 42 U.S.C. § 1983, which provides a civil action against any person who, under color of state law, subjects another person to "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." Plaintiff alleges that the MMSA's warrantless surface mine inspection program violates the Fourth Amendment prohibition of unreasonable searches and seizures. In Count II, Plaintiff seeks relief under Va. Code § 19.2-59, which provides a right of action for "any person aggrieved" by the warrantless "search [of] any place, thing or person." Under Virginia law, it is well established that a court must "harmonize apparently conflicting statutes to give effect to

both." *Boynton v. Kilgore*, 271 Va. 220, 229 (2006). Therefore, this court must read Va. Code § 19.2-59 in light of the MMSA's explicit provision for warrantless inspection of surface mines.

Consequently, the legal sufficiency of Counts I and II depends on whether the MMSA's warrantless inspection program shields Defendants from liability. Defendants will be so shielded if they are entitled to qualified immunity. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Thus, the disposition of both Counts I and II turns on whether the MMSA's warrantless inspection program is "clearly" unconstitutional within the meaning of *Harlow*. Unless it is clearly unconstitutional, Plaintiff has no legal right to recover under Section 1983 or on the related state law claim.

### A.

When evaluating a qualified immunity claim, the district court should generally first determine whether a right "would have been violated on the facts alleged; [and] . . . second . . . whether the right was clearly established." *Smith v. Smith*, 589 F.3d 736, 739 (4th Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194, 200 (2001)); *But see Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009) (finding this sequential analysis "often appropriate" but not mandatory). Thus, I turn first to considering whether Plaintiff would establish a violation of rights on the facts alleged. Although it is a close question, I ultimately conclude that the warrantless inspection program at issue here is constitutional. This is sufficient reason to conclude that Plaintiff fails to state a claim.

In determining what constitutes an unreasonable search, courts have long recognized that there is a diminished expectation of privacy in heavily regulated industries, such as mining.

*Donovan v. Dewey*, 452 U.S. 594, 598-602 (1981); *See also New York v. Burger*, 482 U.S. 691, 702 (1987). Nonetheless, the Fourth Amendment requires some limits on the conduct of warrantless administrative searches, even in such industries. There is no dispute that the Supreme Court provided the definitive test for the constitutionality of warrantless inspection programs in *Burger*:

> First, there must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made. . . . Second, the warrantless inspections must be necessary to further the regulatory scheme. . . . Finally, the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant. In other words, the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to law and has a properly defined scope, and it must limit the discretion of the inspecting officers. . . . In addition, in defining how a statute limits the discretion of the inspectors, we have observed that it must be carefully limited in time, place, and scope.

*Burger*, 482 U.S. at 702-03 (internal quotations and citations omitted). The parties agree, and the court concurs, that the warrantless searches authorized by the MMSA are well within the first two prongs of the *Burger* test.

First, it is clear that there is a substantial government interest in protecting worker health and safety in mines. Upholding warrantless searches pursuant to the federal Mine Safety and Health Act in *Dewey*, the Supreme Court recognized the "undisputed . . . substantial federal interest in improving the health and safety conditions in the Nation's underground and surface mines." 452 U.S. at 602. Virginia Courts have similarly recognized the government's substantial interest in mine safety. *See Commonwealth v. Burgan*, 19 Va. App. 172, 175 (1994). Second, it is well established that warrantless inspection of mining facilities is necessary to further regulatory health and safety goals. "[I]f inspection is to be effective and serve as credible deterrent, unannounced, even frequent inspections are essential. In this context, the prerequisite

of a warrant could easily frustrate inspection." *Burgan*, 19 Va. App. at 175 (quoting *Dewey*, 452 U.S. at 603) (internal quotation and citation omitted).

Thus, the central issue in this case is whether *Burger's* third prong is satisfied because the statute in question provides a "constitutionally adequate substitute for a warrant." 482 U.S. at 703. Defendants aver that because inspections may only be conducted in response to complaints, and since mine owners have a "diminished expectation of privacy" under *Burgan*, 19 Va. App. at 176, the inquiry is over. But the court cannot so lightly brush aside *Burger's* requirement that the discretion of inspecting officers *"must be carefully limited* in time, place, and scope." *Burger*, 482 U.S. at 703 (emphasis added) (internal quotations omitted).

In this case, the statute contains no definite time limits. The statute in *Burger* allowed inspections only "during [the] regular and usual business hours" 482 U.S. at 711 (quotations omitted); *See also United States v. V-1 Oil Co.*, 63 F.3d 909, 912 (9th Cir. 1995) (upholding law authorizing warrantless searches at "reasonable times" where procedures manual instructed officers to conduct inspections "during normally assigned office hours.") In contrast, the MMSA expressly requires inspections to be scheduled "to the extent deemed reasonable and prudent . . . at a variety of hours of the day and days of the week, including evening and night shifts, weekends, and holidays." Va. Code § 45.1-161.292:58B. More importantly, the prerequisite of a complaint does not provide a bright line rule limiting the access of DMME inspectors. Once a complaint has been filed, the law provides inspectors with discretion to conduct a number of follow-up inspections. Indeed, following the April 6, 2008 complaint, inspectors conducted eight post-complaint inspections over a two-month period.

However, the court is mindful that a valid inspection statute need not expressly limit the number of inspections allowed during a given period. Although such limitations may be a

"factor in an analysis . . . they are not determinative of the result so long as the statute, as a whole, places adequate limits upon the discretion of the inspecting officers." *Burger*, 482 U.S. at 712 n. 21; *See also United States v. Ruiz*, 569 F.3d 355, 357 (8th Cir. 2009) (upholding warrantless search statute that provided no time limits where such limitations would "render the entire inspection scheme unworkable and meaningless."). While there are no published cases on point from the Fourth Circuit, other circuits have upheld statutes that contain little if any limitation on the permissible time to conduct searches. In *United States v. Gonsalves*, 435 F.3d 64, 68 (1st Cir. 2006), the First Circuit held that a law permitting the warrantless search of any factory, warehouse, or other establishment in which food, drugs, or cosmetics are manufactured or stored did not run afoul of *Burger's* third prong. It was sufficient that the statute limited the timing to "all reasonable hours" and scope to enforcing the provisions of the Rhode Island Food, Drug, and Cosmetics Act. 435 F.3d at 68.

Numerous courts have upheld the warrantless inspection of commercial vehicles, where the authorizing statute provided no meaningful time limits. In *United States v. Ponce-Aldona*, 579 F.3d 1218, 1224 (11th Cir. 2008), the Eleventh Circuit upheld an Alabama statute despite lack of meaningful time limits because the statute in question provided a "carefully delineated scope that suitably cabins the discretion of the enforcing officer by limiting the search to safety concerns and not authorizing a general search." *See also United States v. Delgado*, 545 F.3d 1195 (9th Cir. 2008); *United States v. Castelo*, 415 F.3d 407 (5th Cir. 2005); *United States v. Maldonado*, 356 F.3d 130 (1st Cir. 2004); *United States v. Vasquez-Castillo*, 258 F.3d 1207 (10th Cir. 2001); *United States v. Dominguez-Prieto*, 923 F.2d 464 (6th Cir. 1991).

In light of those decisions, despite my concern that the statute in question provides little limitation on the timing of warrantless inspections, I nonetheless conclude that the MMSA

sufficiently cabins the scope of any inspections that it does not run afoul of the Fourth Amendment. First, the statute is limited to the inspection of surface mines. Second, the text directs inspectors to "respond to complaints" of certain health and safety violations arising under specific chapters of Title 45.1 of the Virginia Code. The scope is therefore at least as restrictive as that in *Gonsalves*, 435 F.3d at 68. It is at least as restrictive as that upheld in other cases. *See V-1 Oil*, 63 F.3d at 912 (upholding law allowing warrantless search to the extent related to manufacture or transportation of hazardous materials); *Hodgins v. U.S. Dept. of Agriculture*, No. 97-3899, 2000 WL 1785733, at *7 (6th Cir. 2000) (upholding law allowing warrantless search of "places of business and the facilities, animals, and those records required to be kept [under the Animal Welfare] Act.").

Plaintiff emphasizes that DMME procedures explicitly require inspectors to avoid focused or limited investigations, but to divert attention from anonymous complainants by inspecting "a variety of equipment and areas other than those indicated in the original complaint." Compl. Ex. D. But so long as these inspections are germane to uncovering health and safety violations as directed by the statute, they are unproblematic. Where inspectors hold a complaint open indefinitely, and search records unrelated to health and safety violations, it may fairly be said that the inspectors are no longer "responding to a complaint," and thus acting outside of statutory authority. But that does not appear to be the case here.

Therefore, the warrantless inspections authorized by the MMSA are constitutional under *Burger*, and Plaintiff's Section 1983 and state law claims must fail.

**B.**

Because the constitutional issue is a close question, Defendants are entitled to qualified immunity. Qualified immunity shields government officials from suit unless they transgress

9

rights that are "clearly established." *Saucier* 533 U.S. at 200 (2001). A right is "clearly established" if "its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Francis v. Giacomelli*, 588 F.3d 186, 196 (4th Cir. 2009) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). In other words, if there is a "legitimate question" whether the conduct violates a plaintiff's rights, qualified immunity bars suit. *Martin v. St Mary's Dep't of Soc. Servs.*, 346 F.3d 502, 505-506 (4th Cir. 2003).

The Fourth Circuit has taken a narrow view of when a right is clearly established. In *Fields v. Prater*, 566 F.3d 381 (4th Cir. 2009) the court held that defendants had violated the plaintiff's First Amendment rights because they considered the plaintiff's political affiliation in declining to appoint her director of a county department of social services. 566 F.3d at 383. In reaching that determination, the court relied heavily on an earlier case, *McConnell v. Adams*, 829 F.2d 1319 (4th Cir. 1987). There, the court had concluded that the First Amendment prohibited Virginia electoral boards from considering political affiliation in filling county registrar positions. Although the cases were factually very similar, the court concluded that the defendants in *Fields* were nonetheless entitled to qualified immunity. The court reasoned:

> The system Virginia uses for selection of registrars bears significant similarities to that used to select local directors. . . . [In *McConnell*], as here, we concluded that the defendant board could not consider political affiliation because there was no evidence that political affiliation was relevant . . . . There, as here, the state agency whose policies the official in the position at issue would be responsible for carrying out indicated that political affiliation was not an appropriate requirement. . . . However, because a registrar is even less involved in policy-making than is a local director, we do not think that *McConnell* would have *clearly* put defendants on notice that their conduct was unconstitutional.

*Fields*, 566 F.3d at 390 (citations omitted) (emphasis in original). In light of *Fields*, qualified immunity will not be destroyed by the mere existence of a similar case on point, provided that some factual distinctions can be drawn.

10

Here, as in *Fields*, there is no precedent directly on point. On the other hand, there are many examples of courts upholding warrantless administrative searches of mining operations. *See* Ann K. Wooster, *Validity of Warrantless Administrative Inspection of Business That is Allegedly Closely or Pervasively Regulated*, 182 A.L.R. Fed. 467 § 32(a) (citing *Marshall v. Stoudt's Ferry Preparation Co.*, 602 F.2d 589 (3d Cir. 1979); *Marshall v. Donofrio*, 465 F. Supp. 838 (E.D. Pa. 1978) aff'd 605 F.2d 1194 (3d Cir. 1979); *Marshall v. Sink*, 614 F.2d 37 (4th Cir. 1980); *U.S. v. Blue Diamond Coal Co.*, 667 F.2d 510 (6th Cir. 1981); *Andrus v. P-Burg Coal Co.*, Inc. 644 F.2d 1231 (7th Cir. 1981)).

Furthermore, the contours of *Burger's* "constitutionally adequate substitute for a warrant" requirement, and the subsidiary "time, place, and scope" requirement, are not well defined. Courts in this circuit have paid remarkably little attention to *Burger's* third prong. In one unpublished case, the Fourth Circuit limited its analysis to noting that the law authorizing the search of adult businesses during normal business hours "put[] the businesses on notice that the County may, from time to time, inspect their facilities." *Allno Enters., Inc. v. Baltimore Cty.*, 10 F. App'x 197 (4th Cir. 2001). In a number of other cases, courts within this circuit have ruled warrantless searches constitutional without even explicitly evaluating *Burger's* third prong. *See Cottom v. Town of Seven Devils*, 30 F. App'x 230, 236 (4th Cir. 2002) (unpublished opinion); *Adams v. McIntyre*, No. 4:97-cv-210, 1999 WL 33117436 at *3 (W.D.N.C. 1999).

Finally, a showing that a violation of rights is "clearly established" should generally be more difficult where, as here, the defendants acted pursuant to a properly executed state law. In *Illinois v. Krull*, 480 U.S. 340 (1987), the Supreme Court considered whether the Fourth Amendment exclusionary rule barred admission of evidence obtained through a warrantless administrative search conducted pursuant to state law. The exclusionary rule requires

11

suppression of evidence "only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *Krull*, 480 U.S. at 349 (internal quotations omitted). Although distinct, the *Krull* test is analogous to the inquiry here. While the law in *Krull* was subsequently found to violate the Fourth Amendment, the Court held that the exclusionary rule did not apply. Reasoning that state legislators are required to take an oath to support the Constitution, U.S. CONST., Art VI, cl. 3, the Court noted that "courts presume that legislatures act in a constitutional manner" and there was "no basis for believing that legislators are inclined to subvert their oaths and the Fourth Amendment. . ." 480 U.S. at 351 (citations omitted). Likewise, because Defendants in this case were acting in accordance with state law, there is little reason to think that a "reasonable official would understand that what he is doing violates" the Fourth Amendment. *See Francis*, 588 F.3d at 196.

Defendants are therefore entitled to qualified immunity.

### III.

For the reasons set forth herein, Defendants' motion to dismiss will be granted with prejudice in an accompanying order.

The Clerk of the Court is directed to send a certified copy of this memorandum opinion and the accompanying order to all counsel of record.

Entered this 3rd day of November, 2010.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE